U.S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

FILED    **Nov 08 2022**

CAROL L. MICHEL
CLERK

## THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| BRIDGET J. THOMAS | : | CIVIL ACTION NO.: 22-03511 |
| | : | SECTION: "H" |
| VERSUS | : | |
| | : | |
| CHARLOTTE BURROWS, CHAIR, | : | |
| EQUAL EMPOLOYMENT OPPORTUNITY | : | MAGISTRATE: DONNA CURRAULT |
| COMMISSION | : | |

### PLAINTIFF'S FIRST AMENDED COMPLAINT

COMES NOW, Plaintiff BRIDGET J. THOMAS ("Plaintiff"), filing this Plaintiff's First Complaint, complaining of Defendant CHARLOTTE BURROWS, CHAIR, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION ("Defendant") and in support thereof respectfully shows this Court as follows:

### JURISDICTION AND VENUE

1.      Plaintiff invokes the jurisdiction of this Court pursuant to the Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. sections 2000e *et seq.* (Title VII), Section 501 of the Rehabilitation Act of 1973 (Rehab Act), and the Age Discrimination in Employment Act of 1967, as amended. (ADEA) This action arises under laws of the United States regulating commerce and providing for the protection of Civil Rights.

2.      The unlawful employment practices alleged in this amended complaint were committed in the Southern District of Texas, the Eastern District of Louisiana, and the Southern District of Mississippi. Plaintiff was employed in the Eastern District of Louisiana throughout the period complained of in this amended complaint.    Venue is proper pursuant to 42 U.S.C. section 2000e-5(f)(3).

1

**PARTIES**

3.      Plaintiff, BRIDGET J. THOMAS, is a citizen of the United States of America and a resident of Mississippi. Plaintiff has resided in Mississippi throughout the time period covered in this complaint.

4.      Plaintiff avers on information and belief that Defendant, CHARLOTTE BURROWS, CHAIR, EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, is an active United States governmental agency and may be sued in this court under Title VII, the Rehabilitation Act, and the Age Discrimination in Employment Act.

5.      The Defendant is an "employer" within the meaning of section 701(b) of Title VII, the Rehab Act, and the ADEA in that it engages in an industry affecting commerce and has employed the requisite number of employees for the requisite duration under Title VII and the ADEA.

**ADMINISTRATIVE  PROCEDURES**

6.      Plaintiff contacted the Office of Employment Opportunity on December 26, 2019. Her first formal complaint was filed on April 13, 2020.

7.      Plaintiff contacted the Office of Employment Opportunity on September 14, 2021. Her second formal complaint was filed on November 4, 2021.

8.      Plaintiff received a "Notice of Right to File a Civil Action" on January 27, 2022, regarding her first formal complaint, entitling her to commence a civil action within 90 days of her receipt of that notice. Further, this Plaintiff filed within 90 days of the receipt of that notice. A copy of that notice was attached as Exhibit One to her civil action filed on April 26, 2022, and is attached as Exhibit One to this amended complaint.

9.      Plaintiff received a "Notice of Right to File a Civil Action" on August 15, 2022, regarding her second formal complaint, entitling her to commence this action within 90 days of

2

her receipt of that notice.  Further, Plaintiff has filed within 90 days of receipt of that notice.  A copy of that notice is attached to hereto as Exhibit Two to her First Amendment to Complaint.

10.     Plaintiff has satisfied all private, administrative and judicial prerequisites to the institution of this action. All administrative remedies have been exhausted. There are no other laws prohibiting the unlawful employment practices alleged in this complaint under which Plaintiff is obligated to make a complaint or charge.

### STATEMENT OF FACTS
### AMENDED TO INCLUDE PARAGRAPHS 156-166

11.     Defendant is an employer within the meaning of Title VII, the Rehab Act, and the ADEA in that it employs the requisite number of employees under Title VII, the Rehab Act, and the ADEA during all times relevant to this complaint. Plaintiff is a White female, a qualified individual with a disability, and fifty-eight years of age (58) and is employed by the Defendant. Plaintiff's race and gender have been the same throughout the time that the actions complained in this complaint occurred. Plaintiff's age was fifty-three (53) at the start of the actions complained of in this complaint.

12.     Plaintiff began working for the Defendant as a paralegal contractor on November 25, 2014.  Plaintiff's contract work for the Defendant was performed in the Legal Unit, Hearing Unit, and Alternative Dispute Resolution Unit (ADR) within Defendant's New Orleans Field Office (NOFO). Plaintiff's contract paralegal work for the Defendant concluded in December 2016.

13.     Plaintiff was hired by the Defendant on or about January 9, 2017. Plaintiff is currently employed as a GS-11, Step 7 Paralegal within the Hearing Unit of the Houston District Office (HDO). Previously, and during the entire time that the allegations in this complaint occurred, Plaintiff worked within the Enforcement Unit of the NOFO.  Plaintiff worked as an

Investigator Support Assistant (ISA) from January 9, 2017, until June 10, 2018, when Plaintiff began working as a NOFO Equal Opportunity Investigator (Investigator).

14.     In or near early 2016, RAYFORD IRVIN began his employment as District Director (DD) in the Defendant's HDO. Mr. Irvin's district encompasses the Defendant's NOFO. Throughout the time period named in this complaint, Mr. Irvin was employed as the DD for the HDO. As DD, Mr. Irvin was Plaintiff's fifth-line supervisor (S5) except for the period between January 2017 until the summer of 2019 when Mr. Irvin was Plaintiff's fourth-line supervisor. Mr. Irvin is an African American Male with no known disability and is in the protected age group (PAG).

15.     Prior to becoming DD of the HDO, Mr. Irvin was employed as the DD of Defendant's Phoenix District Office (PDO).

16.     In or near October 2016, AMY STILES (COMP2) complained to Plaintiff that her NOFO Investigator colleagues had a problem with her because "the new White girl" had the best closure numbers in the NOFO's Enforcement Unit. Ms. Stiles began her employment with the Defendant as an EO Investigator for the NOFO in 2015. Ms. Stiles was Plaintiff's Enforcement Unit co-worker while Plaintiff worked as an ISA and Investigator. Ms. Stiles' first line supervisor was Ligita Landry until Ms. Stiles separated from her employment with the Defendant in February 2020. Ms. Stiles is a White female with no known disability and is not in the PAG.

17.     On November 2, 2016, the day after the 2016 presidential election, ZAIDA MONCONDUIT and Plaintiff discussed their mutual concerns about the election. Ms. Monconduit stated to Plaintiff, "I know I shouldn't tell you this but I know you'll understand, sometimes I can't stand to be around White people." Prior to November 2014, Ms. Monconduit began her employment in the Defendant's NOFO. Ms. Monconduit worked as the NOFO's Program Manager and reported directly to NOFO's Field Director Keith Hill throughout most of

4

the time period covered by this complaint. Ms. Monconduit was never in Complainant's chain of command. Ms. Monconduit retired from her employment with Defendant in 2019. Ms. Monconduit is an African American female with no known disability and is in the PAG.

18.     In or near November 2016, SIRWANDA HALL (Comp1) applied for Defendant's newly announced NOFO ISA position. Ms. Hall began her employment with the Defendant's NOFO as an Enforcement Unit Office Automation Assistant (OAA) in January 2015. Ms. Hall's 2015 onboarding GS Grade and Step were no less than a GS 5 Step 6. Ms. Hall was Plaintiff's comparator and co-worker throughout most of the time period covered in this complaint. Ms. Hall's first line supervisor was Enforcement's Charge Receipt and Technical Intake Unit (CRTIU or Intake) Supervisor, Mildred Johnson, until sometime in 2017 when Ms. Hall began reporting to Enforcement Supervisor Ligita Landry. Ms. Hall is an African American female with no known disability and was not in the PAG throughout the time period covered in this complaint.

19.     The announcement for the ISA position stated that the job entailed "a variety of administrative, technical and clerical functions," including "organizing, maintaining and transmitting case files; maintaining computerized case related data systems; proofreading documents for correct spelling, grammar, punctuation, and compliance with correspondence policies; and responding to routine requests for information from case files."

20.     Plaintiff applied for the Defendant's NOFO ISA position through a special hiring authority in late 2016.

21.     Disabled applicants for federal employment who seek employment through a special hiring authority must submit a Schedule A with their applications.

22.     The Schedule A letter submitted by Plaintiff to Defendant was signed by Plaintiff's doctor who stated the nature of Plaintiff's disability.

23.     In the application documents submitted by Plaintiff to Defendant for the NOFO ISA position, Plaintiff included a resumé of her work and post-secondary education history.

24.     Plaintiff's resumé submitted with her application noted that Plaintiff, while working as a contractor for the Defendant, had "prepared and served administrative judge orders and notices and maintained electronic and hard copy files of same; edited/proofed legal memorandums for citation accuracy and grammar; utilized WestlawNext to research…case law that addressed issues within the scope of Title VII, ADEA and ADA; categorized, assembled and catalogued, pursuant to NARA and EEOC OLC guidelines, closed litigation files in preparation for disposition to Federal Records Center; created written procedure for use by all EEOC Legal Units, regarding accession/archiving of litigation records…"

25.     Compl did not make the Certificate of Applicants list (cert list) for the ISA position and could not be considered for the position.

26.     On or near January 5, 2017, SHANITA WILLIAMS telephoned Plaintiff and offered Plaintiff the NOFO ISA position with a starting GS 5 grade. Prior to and for part of 2017, including the early months of 2017, Ms. Williams was employed by the Defendant as a Human Resources Assistant for the HDO.  In 2017, Ms. Williams was promoted to District Resource Manager (DRM2) for the Defendant's HDO, a position Ms. Williams held throughout most of the actions named in this complaint.  As a HR Assistant, Ms. Williams' first line supervisor was HDO's Acting DRM, Ronald Davis.  As a DRM, Ms. Williams' first line supervisor was Mr. Irvin until sometime in 2019.  Ms. Williams has never been in Complainant's chain of command.  Ms. Williams is an African American female with no known disability and is in the PAG.

27.     On or near January 5, 2017, Plaintiff requested from DRM2 that Plaintiff be onboarded as a GS 7 due to Plaintiff's contract paralegal work for the NOFO's Legal, Hearing and

ADR Units for which Plaintiff was a GS 9-paid contractor and for which Plaintiff had demonstrated ample clerical and administrative skills, skills required for the ISA position.

28.     During the same January 5th conversation with DRM2, Plaintiff also requested that Plaintiff's master's degree be considered before onboarding Plaintiff for the ISA position.

29.     DRM2 did not provide Plaintiff with an answer to Plaintiff's special request for consideration when onboarding Plaintiff and, instead, informed Plaintiff that DRM2 would "ask" about Plaintiff's request and call Plaintiff later.

30.     On or near January 5, 2017, after Plaintiff spoke with DRM2, RONALD DAVIS, HDO's Acting District Resource Manager (DRM1) telephoned Plaintiff.  As Acting DRM for the HDO, Mr. Davis reported directly to Mr. Irvin.  Prior to becoming DRM1 for the HDO, Mr. Davis was the DRM for the Phoenix District Office while Mr. Irvin was employed as District Director of that office.  Mr. Davis was never in Plaintiff's chain of command. Mr. Davis is a male whose race and age and whether he has a disability are unknown.  Mr. Davis retired from his employment with the Defendant after the actions named in this complaint had occurred.

31.     During Plaintiff's January 5th telephone conversation with DRM1, Plaintiff informed DRM1 that Plaintiff held a master's degree, had worked as a GS 9-paid paralegal contractor for the NOFO for more than two years, and asked DRM1 if Plaintiff could be onboarded, at a minimum, as a GS 5 Step 6 ISA with a pay rate of $38,321 or, at best, as a GS 7.   DRM1 responded to Plaintiff and stated that because the way the ISA position had been announced, Plaintiff could not be onboarded as a GS 7.

32.     On January 9, 2017, Plaintiff began her employment as an ISA with the Defendant and was onboarded as a GS Grade 5 Step 1 earning $32,844.

33. On or near January 9, 2017, unknown to Plaintiff, Plaintiff's onboarding SF-50 was filed with the Defendant's Office of the Chief of Human Capital (OCHCO) noting that Plaintiff's education level was that of a "high school graduate."

34. On January 23, 2017, DRM1 requested from Plaintiff, via email, a copy of Plaintiff's "BS degree."

35. On January 24, 2017, Plaintiff emailed DRM1 a copy of Plaintiff's master's degree.

36. On January 30, 2017, Plaintiff emailed DRM1 to thank him "for considering [Plaintiff's] request, prior to [Plaintiff's] acceptance of the [ISA position], to have [Plaintiff's] initial ranking begin as a GS 5 Step 6." Plaintiff further stated in the email that she appreciated the DRM1 "having explained the difficulty in [Plaintiff] acquiring [the GS 5 Step 6] ranking upon entry into federal service despite [Plaintiff's] work experience and academic credentials."

37. To Plaintiff's knowledge and belief, in or near February 2017, COMP2, a White female, filed a grievance or complaint with NOFO management and/or the local union wherein COMP2 accused a NOFO Investigator of race-based harassment.

38. In or near April 2017, Comp1 accused Plaintiff of not following the instructions of their mutual supervisor, Mildred Johnson.

39. In or near April 2017, Plaintiff was issued a verbal warning by NOFO's CRTIU or Intake Supervisor, MILDRED JOHNSON. (IS1) Prior to 2014, Ms. Johnson began her employment with the Defendant working in the NOFO. Throughout the time period contained in this complaint, Ms. Johnson worked as the NOFO's Enforcement Intake Supervisor. Ms. Johnson was Plaintiff's first-line supervisor upon Plaintiff's January 2017 hiring and until Plaintiff was promoted to Investigator in June 2018. Ms. Johnson is an African American female with no known disability and is in the PAG.

40.    In or near May 2017, S5 stated Plaintiff's name during a NOFO staff meeting, which was the first of two times when S5 stated Plaintiff's name before April 22, 2020, when S5 stated Plaintiff's name for a third time over a more than 3-year period.

41.    In or near June 2017, SCARLETT MARIN (CW1) accused Plaintiff of not following the instructions of IS1, CW1's and Plaintiff's mutual supervisor. IS1 responded by instructing Plaintiff to re-copy four sets of charge closure documents and to refrain from highlighting in yellow the names of the copied or cc'd recipients. Ms. Marin began her employment with the Defendant's NOFO as an OAA prior to 2014. Ms. Marin was Plaintiff's co-worker. Ms. Marin's first line supervisor was IS1 throughout the time period covered in this complaint. Ms. Marin is a Hispanic female with no known disability and is not in the PAG.

42.    In or near June 2017, IS1 implemented a new policy for her department's staff, which included Plaintiff, Comp1, CW1 and ISA Elaine Jordan, that required co-workers to together meet with IS1 if the co-workers disagreed about their understandings of IS1's instructions.

43.    Prior to 2014, ELAINE JORDAN began her employment with the Defendant's NOFO. Ms. Jordan was Plaintiff's co-worker. Ms. Jordan's first line supervisor throughout the time period covered by this complaint was IS1. Ms. Jordan retired from employment with the Defendant in early 2020. Ms. Jordan is an African American female with no known disability and is in the PAG.

44.    Sometime during 2017, Comp1, who had worked as an Intake or CRTIU OAA from 2015 through 2016, began reporting directly to Enforcement Supervisor Ligita Landry. Ms. Landry and Ms. Johnson were each Enforcement Unit Supervisors. Comp1 was the first and only NOFO non-Investigator to directly report to the non CRTIU/Intake Supervisor.

45.    In or near October 2017, IS1 rated Plaintiff as "outstanding" in Plaintiff's annual performance evaluation.

46.     In or near October 2017, Plaintiff began using the same commuter vanpool service as ISA Elaine Jordan who had been using the service for more than ten years without incident.

47.     On November 9, 2017, DRM1 emailed the HDO and NOFO employees and stated, "…it was a pleasure working/supporting the Houston District over the past couple of years…while [DRM2] transitions into the DRM role…"

48.     During the spring of 2018, Plaintiff began observing NOFO's Enforcement Unit staff CW1, COMP2, Jennifer Mitchem, Charlotte Davis and Tania Reyes not infrequently taking breaks and lunch breaks together, with the co-workers continuing their workplace break and lunch gatherings through and until the NOFO initiated 100% telework, in March 2020, due to the Covid-19 pandemic.  Two of the co-workers, CW1 and Ms. Reyes, also daily assisted each other by alternatingly leaving the office and adding money to their respective parking meters until 100% telework began.

49.     JENNIFER MITCHEM transferred to and began working in the Defendant's NOFO as a Sr. Investigator in 2017 (CW2).  Ms. Mitchem was Plaintiff's co-worker.  Ms. Mitchem's first line supervisor was ES1 in the time period covered in this complaint.  Ms. Mitchem is an African American female with a disability and is in the PAG.

50.     Prior to 2015, CHARLOTTE DAVIS became employed by the Defendant and was a Sr. Investigator for the NOFO during the time period covered in this complaint.  Ms. Davis was Plaintiff's co-worker. (CW4) Ms. Davis' first line supervisor was ES1 throughout the time period covered by this complaint.  Ms. Davis is an African American female with no known disability and is in the PAG.

51.     Prior to 2015, TANIA REYES became employed by the Defendant as a NOFO ISA.  In 2016, Ms. Reyes was promoted to NOFO EO Investigator.  Ms. Reyes was Plaintiff's co-

worker. (CW5) Ms. Reyes' first line supervisor was ES1 throughout the time period covered by this complaint. Ms. Reyes is a Hispanic female with no known disability and is in the PAG.

52.     In or near March 2018, Plaintiff applied for an announced Legal Tech position in the HDO Hearing Unit after consulting with NOFO Field Director (FD), KEITH HILL who stated that there would likely be no problem for Plaintiff to conduct the Hearing Unit's work while working out of the NOFO. Mr. Hill began his employment in the Defendant's NOFO prior to 2014. As the NOFO's FD, Mr. Hill directly reported to S5 until sometime in 2019 when S5 became Mr. Hill's second-line supervisor. As FD, Mr. Hill was Plaintiff's third-line supervisor (S3). Mr. Hill retired from employment with the Defendant in or near early 2021. Mr. Hill is an African American male with no known disability and is in the PAG.

53.     Plaintiff made the cert list for the Legal Tech position under a special hiring authority due to Plaintiff's disability and by having submitted a Schedule A letter with her resumé.

54.     On April 17, 2018, DRM2 asked Plaintiff to show proof that Complainant had timely responded to DRM2's invitation to be interviewed for the Hearing Legal Tech position slated to occur on April 17th.

55.     On April 17, 2018, S5, S3 and either DRM2 or another HDO management official sat on the 3-person interview panel for applicants for the Legal Tech position. At the opening of Plaintiff's interview, S5 asked Plaintiff to provide S5 with a copy of the interview acceptance email that showed Plaintiff had timely accepted the invitation for the Legal Tech interview.

56.     On April 17, 2018, S5 abruptly and prematurely ended the interview of Plaintiff for the Hearing Legal Tech position.

57.     On April 17, 2018, Plaintiff emailed S5, requested that Plaintiff be interviewed similar to all candidates for the position, and stated, "Per your request of me at the top of my

interview this morning...please find below my forwarded email response originally emailed to [DRM2] on April 14, 2018, at 11:16 a.m. CST."

58.     Plaintiff was not offered the HDO Hearing Legal Tech position despite Plaintiff's previous experience working as a paralegal in the Hearing Unit and despite Plaintiff having had, from December 2017 through January 2018, developed a standard operating procedure for processing incoming hearing requests per S3's instruction.

59.     In late April 2018 or early May 2018, Plaintiff and Comp1 each applied for one of two Investigator positions Defendant opened for the NOFO.

60.     On May 15, 2018, S3 announced, via email, the selection of Plaintiff and Comp1 for the Investigator positions.  Two of the NOFO's eight Investigators congratulated Plaintiff on her selection.  CW1, COMP2, CW2, CW3, and CW4 were not among them.

61.     In or near late May 2018, after S3 announced, via email, Plaintiff's selection for one of the two NOFO Investigator positions, COMP2 accused Plaintiff and CW6 of stealing time.

62.     While it was determined in May or June 2018 that neither Plaintiff nor CW6 were stealing time as alleged by COMP2, they were advised by S3 to acquire personal iPads and set up personal internet hot spots so that each could conduct one hour of telework per day during their 4 days of commuting via vanpool each week.

63.     Plaintiff and Comp1 were each promoted to Investigator effective June 10, 2018, with Plaintiff having been promoted as a GS 7 Step 1 Investigator earning $41,365, and Comp1 having been promoted as a GS 7 Step 5 Investigator earning $46,879.

64.     Upon Plaintiff's June 2018 promotion, Plaintiff began reporting directly to LIGITA LANDRY, Enforcement Supervisor (ES1), to whom Comp1 had reported since 2017.  Ms. Landry began her employment in the NOFO prior to 2014.  In or near 2015, Ms. Landry was promoted from NOFO Investigator to NOFO Enforcement Supervisor.  As a NOFO Enforcement Supervisor,

Ms. Landry reported directly to Uma Kandan, Enforcement Manager, throughout the time period contained in this complaint. Ms. Landry remained Plaintiff's ES1 until May 25, 2020, when Shwann Brignac was promoted to Enforcement Supervisor. (ES2) Ms. Landry is an African American female with no known disability and is in the PAG.

65.     Starting in May 2018, before Comp1 and Plaintiff officially began their roles as Investigators, and through May 28, 2019, NOFO Sr. Investigator TANYA DARENSBURG (CW3) invited Comp1 to accompany Ms. Darensburg on multiple onsite investigations wherein Comp1 performed notetaking duties for Ms. Darensburg. The multiple onsites involved one systemic case.

66.     Taking notes during an onsite conducted by another Investigator is defined as "participating" in the onsite. NOFO ES1 required all new Investigators to "participate" in no less than 2 onsites with Sr. Investigators before NOFO ES1 would approve a new Investigator conducting her/his own onsites.

67.     Prior to 2015, Ms. Darensburg became employed by the Defendant. Ms. Darensburg was a Sr. Investigator for the NOFO during the time period covered in this complaint. Ms. Darensburg was Plaintiff's co-worker. Ms. Darensburg's first line supervisor was ES1 until May 25, 2020, when Ms. Darensburg began reporting to ES2. Ms. Darensburg is an African American female with no known disability and is in the PAG.

68.     On June 12, 2018, Plaintiff emailed ES1 and complained that CW2, the Lead Investigator on a systemic case to which Plaintiff had been recently assigned, scheduled a meeting for the team on a Monday, Plaintiff's regular off day known by CW2, and failed to teleconference Plaintiff into the meeting despite Plaintiff's offer to change her work schedule to be available on the day of the meeting.

69.     On June 19, 2018, Plaintiff emailed ES1 and requested approval to participate in a June 28, 2018, outreach opportunity. Outreach was defined as events or occurrences that allowed NOFO employees to inform individuals, business entities and/or their representatives of the services the Defendant can provide, sometimes with a small fee, with the intent of helping the business entities, etc., prevent and stop workplace discrimination. All Investigators were required to conduct outreach activities per ES1.

70.     ES1 orally responded to Plaintiff's June 19, 2018, request to perform outreach and informed Plaintiff that ES1 would approve Plaintiff's participation in outreach after Plaintiff had become a more "seasoned" Investigator, i.e., Plaintiff was denied this opportunity.

71.     In or near late June or early July 2018, S5 stated Plaintiff's name when he informed staff during a staff meeting that Plaintiff and Comp1 had been promoted to Investigators. This occurrence was the second time Plaintiff can recall that S5 stated Plaintiff's name, with the third time later occurring on April 22, 2020.

72.     On July 11, 2018, Plaintiff emailed ES1 and informed her that Plaintiff had acquired an iPad and had purchased a hotspot for vanpool telework use.

73.     In or near July 2018, Plaintiff orally complained to NOFO ES1 and NOFO Enforcement Manager UMA KANDAN (EM) that CW2 was excluding Plaintiff from meetings regarding the systemic case to which Plaintiff had been assigned with CW2. At the same time, Plaintiff complained to them that Comp1 had been allowed to participate in a systemic case's onsites prior to and shortly after Comp1 and Plaintiff were promoted to Investigators. EM responded to Plaintiff's complaint that Comp1 had "only been a note taker" at the onsites, and NOFO ES1 advised Plaintiff to insert herself into the systemic meetings led by CW2 whether invited or not and when Plaintiff learned of the meetings.

14

74.     The EM began her employment in the Defendant's NOFO prior to 2014. Throughout the time period contained in this complaint, Ms. Kandan was employed as the NOFO's Enforcement Manager and was Plaintiff's second line supervisor.  As the NOFO's EM, Ms. Kandan directly reported to Mr. Hill and whose second line supervisor was S5. Ms. Kandan is Asian, has no known disability and is in the PAG.

75.     In or near late August 2018, Plaintiff orally complained to the NOFO ES1 and EM that Plaintiff was being assigned the same number of in-person intake interviews as Comp1 although Comp1 had been given vastly more opportunities to conduct in-person interviews prior to their promotion to Investigators.

76.     In September 2018, Plaintiff and Comp1 were assigned by ES1 to be mentored by CW2 and CW3, respectively, over the following six-month period.

77.     On September 11, 2018, CW2 emailed Plaintiff and advised Plaintiff to allow CW2 to review Plaintiff's work prior to Plaintiff submitting Plaintiff's work to ES1 for approval.

78.     Soon after September 11, 2018, Plaintiff orally complained to NOFO ES1 that CW2 had instructed Plaintiff to rewrite the closure recommendation of a low-priority charge three times despite CW2 having also stated that no substantive changes to the recommendation were necessary, i.e., CW2 instructed Plaintiff to make writing style changes three separate times to one low-priority closure recommendation.

79.     In October 2018, NOFO ES1 conducted Plaintiff's fiscal year 2018 evaluation despite the fact that NOFO IS1 had been Plaintiff's direct supervisor 70% of the time and ES1 had been Plaintiff's direct supervisor 30% of the time during fiscal year 2018.

80.     NOFO ES1 evaluated Plaintiff as "fully successful" for fiscal year 2018, or two levels below Plaintiff's fiscal year 2017 rating of "outstanding" as assessed by IS1.

81.     On or near October 25, 2018, Plaintiff informed ES1 that Plaintiff was concerned that Plaintiff and her mentor, CW2, were not regularly meeting to review Plaintiff's work inventory and assist Plaintiff.  In response and as advised by ES1, Plaintiff requested, via an October 25, 2018, email to CW2, that CW2 be available and schedule to meet with Plaintiff one hour per week each week.

82.     In an email sent to EM1 and ES1 from Plaintiff on November 2, 2018, Plaintiff asked to be immediately reassigned for mentoring from CW2 to "another Senior Investigator." Plaintiff further stated, "I do not feel it is in my best interest or wise, professionally, for me to be mentored by a colleague who appears unwilling to provide the work guidance I have and am requesting.  At this juncture, I also question whether CW2's treatment of me and my questions is in furtherance of the Commission's mission or her own."

83.     On November 8, 2018, in response to Plaintiff's November 2nd email, the NOFO's EM, ES1, CW2 and Plaintiff met to reset the mentor/mentee relationship between CW2 and Plaintiff.

84.     In or near the first week of December 2018, Complainant, ES1 and the EM met and Plaintiff orally informed them that CW2 and Plaintiff had met only two times for weekly scheduled meetings. ES1's response was that ES1 would address the issue after the upcoming holidays. During the same meeting, Plaintiff complained that Plaintiff was not receiving the same mentoring and training as Comp1.

85.     Beginning from December 22, 2018, through January 25, 2019, federal government agency employees, including Defendant's employees, were furloughed due to a federal government shutdown.

86.     On February 12, 2019, Plaintiff addressed and emailed a memo to the NOFO's EM1 and ES1 with the subject "Concerns regarding mentoring and individual development plan."

16

Plaintiff stated in the memo, "Given that neither Sr. Investigators nor my own mentor have included me, as a shadow participant, in On-Sites, Conciliation Discussions, etc., could you please facilitate my participation?"

87.     In late February or early March 2019, ES1 informed Plaintiff that the six-month mentoring period had concluded and no additional mentor/mentee meetings with CW2 would be scheduled.

88.     On March 5, 2019, Plaintiff emailed ES1 and asked ES1 to advise Plaintiff on the next steps Plaintiff should take for a charge that Plaintiff would be recommending for cause processing.

89.     To Plaintiff's knowledge and belief, in or near April 2019, COMP2 filed either a grievance or complaint against a NOFO Sr. Investigator regarding race-based harassment when the Sr. Investigator allegedly called COMP2 "Wonder Bread."  The investigation resulted in the discipline of the harassing Sr. Investigator who is not in the protected class of Plaintiff.

90.     On April 24, 2019, Plaintiff volunteered, via email to NOFO's Outreach Coordinator and cc'd NOFO's ES1, to assist a Sr. Investigator and participate in the 2019 Department of Labor's Compliance Assistance Event for which the NOFO's Outreach Coordinator had solicited volunteers.  ES1 did not respond to Plaintiff's request to volunteer.

91.     On May 8, 2019, directly after a NOFO Enforcement Unit meeting wherein ES1 solicited for volunteers for an outreach opportunity scheduled for May 21, 2019, at Lakeside Mall, Plaintiff orally offered to volunteer to ES1. On May 9, 2019, ES1 emailed NOFO's Investigators and informed them that ES1 had chosen four volunteers for the outreach.  Plaintiff was not chosen.

92.     On May 15, 2019, COMP2 bullied Plaintiff during Investigator training regarding sexual harassment.  In response to the bullying, Plaintiff addressed two emails to the attention of ES1, one on the date of the bullying and a second on May 24, 2019, the latter as per ES1's request.

93.     In the May 15th email of complaint, Plaintiff stated, in relevant part, "...[COMP2] specifically targets me and the information I try to impart whenever I dare to attempt to contribute..."

94.     During the afternoon of May 15, 2019, a telephone conference was held between Plaintiff and the Defendant's Disability Program Manager, Jackie Cumber.  ES1 was present for the meeting which was held via the ES1's office and office telephone.  During the meeting, which addressed Plaintiff's request for a telework reasonable accommodation (RA), Plaintiff explained the specifics of her disability and named the medications and dosages prescribed to and taken by her.

95.     On May 21, 2019, Ms. Cumber emailed Plaintiff and ES1 and attached Ms. Cumber's approval to Plaintiff's RA request.  Ms. Cumber stated in the email, "Greetings [Plaintiff and ES1] and thanks for meeting with me to discuss the RA request."

96.     On May 24, 2019, Plaintiff emailed to ES1, as requested by ES1, Plaintiff's second, more detailed complaint regarding the May 15th incident.  Plaintiff stated, in relevant part, "I suspect [COMP2] badgers me because of the combination of my characteristics, White, female and 55 years old."

97.     The Defendant's policy for reporting harassment states, in relevant part, "If harassing conduct is reported to a supervisor or manager...s/he must notify his/her Office Director (unless the Office Director is the alleged harasser) ***and the Agency Harassment Prevention Coordinator*** as soon as possible, ***but no later than within three (3) business days***, ***after becoming aware of the alleged conduct***.  The Agency Harassment Prevention Coordinator will then process the report..." (emphasis added)

98.     On May 29, 2019, ES1 facilitated Plaintiff's first participation in an onsite which was more than one year after ES1 had facilitated Comp1's participation.

99.     In or near the summer of 2019, TRAVIS NICHOLSON began his employment in the Defendant's HDO as Deputy District Director (DDD).  As DDD, Mr. Nicholson reports directly to S5.  Mr. Nicholson became Plaintiff's fourth-line supervisor (S4) in the summer of 2019.  Mr. Nicholson is an African American male with no known disability and is in the PAG.

100.    On July 24, 2019, two months after Plaintiff complained of harassment via email to ES1, ES1 emailed the Defendant's Labor Relations Staff Member, Yolanda Owens, and stated, "In response to the [May 24, 2019] complaint received, I met with [Plaintiff] twice to discuss and advised senior management."

101.    On or shortly after July 24, 2019, ES1 orally informed Plaintiff that S3 had become concerned with stakeholder privacy while Plaintiff conducted telework during Plaintiff's vanpool commute and, therefore, S3 would no longer permit vanpool telework.

102.    At the same time ES1 notified Plaintiff of the vanpool decision, ES1 stated that "the same person [COMP2] who previously complained [about you stealing time] has complained again."  ES1, without naming to whom COMP2 had allegedly complained this second time, indicated, by the motioning of ES1's head, that COMP2 had complained to HDO management.

103.    In response to ES1's indication that HDO management was responsible for the removal of Plaintiff's vanpool telework, Plaintiff stated to ES1 that Plaintiff believed S5 was behind the adverse decision based on Plaintiff's race.

104.    On the same date ES1 notified Plaintiff of S3's decision, Plaintiff met with S3 in his office and explained to him why conducting telework during Plaintiff's vanpool commute posed no privacy risk to stakeholders.  Plaintiff also explained to S3 why C6's vanpool work similarly posed no privacy risk.

105.    On the same date Plaintiff met with S3, S3 reversed the decision to end vanpool telework and instructed Plaintiff and C6 to continue their vanpool telework.

106.    In or near the first week of August 2019, during a conference-room held meeting among six NOFO employees who were intermittently present, all who were African American except for Plaintiff, Comp1 stated to Plaintiff, "You need to stay in the video so the EEOC can show we have some diversity."

107.    On August 8, 2019, S5 ignored Plaintiff while he acknowledged CW2 when Plaintiff and CW2, who arrived together, were the first arrivals after S5 and S4 for the NOFO's off-site located annual Technical Assistance Program Seminar (TAPS).

108.    On August 8, 2019, Plaintiff complained to S3, IS1 and ES2 that S5 treated Plaintiff differently, especially as compared to his treatment of Comp1.

109.    On or near August 8, 2019, S3 informed S5 that Plaintiff had alleged that S5 was discriminating against Plaintiff based on Plaintiff's race.

110.    In an August 19, 2019, text message received by Plaintiff from ES1, ES1 states, "Please do not do any EEOC work during your commute to the office tomorrow.  I will discuss with you when you come in."

111.    On August 20, 2019, ES1 informed Plaintiff that Plaintiff would no longer be allowed to conduct telework during her vanpool commute and, therefore, Plaintiff would need to change her work schedule from a 4/10 to either 5/4/9 or straight 8s.

112.    Defendant's Memorandum of Understanding (MOU) between the NOFO and local union regarding telework defines twelve reasons when a NOFO employee can be removed from telework.  Plaintiff did not violate any of the twelve but Plaintiff was removed from vanpool telework and, subsequently, was forced to change her work schedule.

113.    On or near August 20, 2019, S3 gave a new reason, compared to S3's late July 2019 reasoning, to explain management's decision to remove Plaintiff (and CW6) from vanpool telework.  S3 stated he "..had made the decision to end the [telework] arrangement because I had

20

misunderstood the underlying reason or basis for making the [telework] arrangement in the first place…I explained to [Plaintiff] that the issue was about being able to justify the use of telework (doing work on a shuttle) and then properly recording [Plaintiff's] time and attendance."

114.    In an August 21, 2019, dated email from ES1 to Timekeeper CW1, cc'd to Plaintiff, ES1 instructed CW1 to "change [Plaintiff's] schedule in QT to 5/4/9 effective 9/18/19—1st Monday off and 7:30 – 5:00."

115.    On August 28, 2019, Plaintiff complained, via email, to the EM1 and ES1 that COMP2 had excluded Plaintiff from a luncheon birthday celebration for CW4 that had been organized by COMP2 and for which all NOFO Investigators present at the office on the date had been invited, except for Plaintiff.

116.    On Friday, September 27, 2019, CW1, who was given authority to assign NOFO Investigators to conduct interviews of walk-in potential charging parties (PCPs), scheduled Plaintiff to conduct a walk-in interview after the day's interview times, which concluded at 12:30 p.m. on Fridays, had been exceeded.

117.    On October 3, 2019, IS1 addressed an email to Plaintiff and CW1 wherein IS1 stated, "Hi [Plaintiff and CW1], Since [Plaintiff] will be out of the office until 10/9/2019, I'm asking CW1 to contact R for POC or manually send the 131NA [which Plaintiff had forgotten to do before taking leave and which needed to be served by Tuesday, October 8, 2019.]"

118.    On October 9, 2019, Plaintiff returned to work, emailed IS1and stated, "Thank you for catching the lack of R POC for the NOC and alerting me and [CW1]. Unfortunately, it appears [CW1] overlooked your email[ed directions] on Friday, 10.4; Monday, 10.7; and Tuesday, 10.8." Plaintiff continued, "…I feel I have little to no backup if/when I need assistance from co-workers…I erred in not entering the R POC when I formalized the charge on 9.27.19, but I

21

consistently seek to provide excellent customer service to Rs and CPs. Whom does [CW1] consistently serve? This situation is unfortunate and disheartening."

119.    On October 9, 2019, CW1 insinuated that Plaintiff was attempting to steal time when CW1 emailed Plaintiff three times and, in one email, stated, "Your leave slip is incomplete! Please add your leave for [Friday, October 4, 2019]."

120.    Plaintiff, while absent from work on October 4th, had prior approval from ES1 to switch Plaintiff's Monday off day to Friday, meaning Plaintiff would not be charged for leave on October 4, 2019, and was not required to submit a leave slip for the date.

121.    According to the Defendant's Time and Attendance Processing guidelines, Supervisors are responsible for verifying and certifying time and attendance records before submission, not Timekeepers such as CW1.

122.    On November 13, 2019, a monthly NOFO Enforcement Staff meeting was held during which CW3 stated there were "more Investigators [than Plaintiff]" after Plaintiff had emailed IS1 and the EM with Plaintiff's concern that Intake assignments were not being distributed equally.

123.    On November 13, 2019, during the same meeting, CW5 stated that it was "unfair" that Intake assignments would be allocated by a new means "because of [Plaintiff]."

124.    During the same November 13th meeting, S5 restated what CW5 had stated, "because of one Investigator, huh?"

125.    In response to CW3's, CW5's and S5's statements, Plaintiff stated, "I'm sure most of you know I was the Investigator who complained to [NOFO management.] I assumed other Investigators had similarly complained about the issue due to my conversation with another Sr. Investigator."

126.    S5 responded to Plaintiff's statement by asking, "Oh, so you assumed?"

22

127.    S5's attendance at the November 13th meeting was unusual, and it would have been unusual for S3 to attend as well. S3 was not in attendance.

128.    On or near November 14, 2019, Plaintiff met in S3's office with S3, ES1, the EM, and possibly IS1. Plaintiff stated that Plaintiff believed S5 was harassing Plaintiff based on Plaintiff's race and that, based on what Plaintiff observed in the November 13th meeting, Plaintiff now believed that Plaintiff's Investigator co-workers were "following [S5's] lead."

129.    In or near November 2019, S3 reported to S5 that Plaintiff accused S5 of discriminating against Plaintiff based on Plaintiff's race.

130.    On December 17, 2019, CW3 and CW4 instructed Plaintiff to process the day's intake per their instructions, not the IS1's instructions made effective as of November 18, 2019.

131.    On December 17, 2019, Plaintiff complained to the EM, ES1 and IS1 that "[CW3 and CW4] told me to do X this morning.  While [CW2] was paying a visit to the Intake area, [CW4] came into my [intake] office and told me to do Y.  And then [CW3] denied ever telling me to do X....They and their cabal are poisonous to the work environment."

132.    On December 18, 2019, Plaintiff experienced a panic attack while driving, a disability-related symptom Plaintiff had last experienced in 2005.  During or immediately after the panic attack, Plaintiff called S3's Secretary, SONJA LAMPTON, and asked Ms. Lampton to provide Plaintiff with the phone number for the EEOC's internal mediation unit, Resolve.

133.    On or near December 19, 2019, Plaintiff contacted Resolve and asked it to intercede on Plaintiff's behalf and have Plaintiff transferred from HDO and NOFO to the Saint Louis District Office.  HDO management refused to approve Plaintiff's transfer.

134.    On December 26, 2019, Plaintiff made contact with the OEO and initiated the pre-counseling period.

135.     On January 2, 2020, and January 14, 2020, Plaintiff sought, via emails, DRM2's explanation of the "4" shown in Box 42 (Education Level) on Plaintiff's SF-50s.

136.     DRM2's emailed response to Plaintiff's January 2nd and 14th queries was "I got [your] email and I [am] waiting on a response."  DRM2 failed to provide Plaintiff with further information and response.

137.     On January 22, 2020, OCHCO Staff Member Jewel Gilliam emailed and provided Plaintiff with the meaning of the "4" on Plaintiff's SF-50: "High School graduate."

138.     In or near the end of February or beginning of March 2020, S4 met with Plaintiff in Plaintiff's office as S4 had stated he was planning to do separately with all NOFO Investigators. During the conversation, Plaintiff orally informed S4 that Plaintiff had filed a complaint of discrimination involving S5.

139.     On March 12, 2020, EO Counselor HEATHER BROWN, an employee of Defendant's Office of Employment Opportunity (OEO), emailed the EM and scheduled an appointment for March 17, 2020, to speak with EM regarding Plaintiff's allegations.  On March 17, 2020, EM canceled the appointment and the appointment was not rescheduled.

140.     On March 12, 2020, Ms. Brown emailed ES1 and scheduled an appointment for March 23, 2020, to speak with ES1 regarding Plaintiff's allegations.  On March 23, 2020, ES1 canceled the appointment and the appointment was not rescheduled.

141.     On April 13, 2020, Plaintiff formally filed her EO complaint.

142.     On April 20, 2020, S5 and S3 were copied or cc'd on the emailed notice addressed to Plaintiff that acknowledged receipt of Plaintiff's formally filed EO complaint.

143.     On April 21, 2020, S5, S4 and DRM2 participated in a group email among the three whose subject line was "Thomas."

144.     On April 22, 2020, S5 stated Plaintiff's name during a telephone conference meeting with the NOFO's staff and management. Plaintiff memorialized the occurrence in her hand-written notes because it was only the third time S5 had stated Plaintiff's name during a more than 3-year period.

145.     In an April 28, 2020, email from OEO's Leona Clark to DRM2, Ms. Clark states, "I have been assigned to process a formal complaint of discrimination filed by [Plaintiff]."

146.     On May 21, 2020, nearly one year after OEO's Ms. Owens received ES1's email notifying Ms. Owens of Plaintiff's May 24, 2019, complaint, Ms. Owens provided the following explanation to the Director of the Office of Employment Opportunity (OEO) Stan Pietrusiak regarding the handling of Plaintiff's May 24, 2019, complaint: "The email from [Plaintiff] was not filed as a grievance. It was a workplace matter [Plaintiff] alerted [ES1] of and they responded."

147.     On May 25, 2020, SHWANN BRIGNAC was promoted to NOFO Enforcement Supervisor (ES2). Upon Ms. Brignac's promotion, Plaintiff, Comp1, WAYNE MORGAN and CW3 became Ms. Brignac's direct reports while the Enforcement Unit's other Investigators were assigned to ES1's supervision.

148.     On June 10, 2020, Comp1's and Plaintiff's shared anniversary date, Comp1 was promoted from a GS 9 to GS 11 Investigator per the emailed recommendation of ES1 to EM dated May 8, 2020. In the same email, ES1 said "no" to Plaintiff's promotion.

149.     On June 10, 2020, during Plaintiff's teleconferenced meeting with ES2 and EM, Plaintiff was informed by EM that Plaintiff was being promoted by one Step, to a GS-9 Step 2 earning $54,668 per annum, instead of being promoted to a GS-11 Step 1 earning $64,009 per annum.

150.     During the June 10th conversation, Plaintiff realized that the EM's "Suspense Report," which indicated the number of charge resolutions Plaintiff had recommended for closure, was grossly inaccurate and undercounted Plaintiff's production by more than 60%.

151.     During the June 10th conversation, Plaintiff orally complained that Plaintiff believed Plaintiff was being retaliated against.

152.     On June 11, 2020, Plaintiff emailed EM and ES2 and cc'd OEO's Devona Jefferson. In the June 11th email, Plaintiff stated, in relevant part, "I cannot help but view management's failure to accurately record my production and promote me to a GS-11 as born, at least in part, in response to my EO complaint." Plaintiff further stated, "As I told [S3 in November 2019], attitudes about me and treatment of me turned on a dime, overnight, from the moment I had the temerity to accept [the ISA position] that had been earmarked for [Comp1,] a young, Black Female."

153.     On June 10, 2020, and June 11, 2020, Plaintiff researched and compiled the complete list of resolution or closure recommendations Plaintiff had provided to ES1 since January 2020, and provided the separate lists to the EM and ES2, and ES2, respectively.

154.     On September 11, 2020, Plaintiff, who had not been promoted to a GS 11 despite Plaintiff having shown proof, within twenty-four hours of Plaintiff's June 10th anniversary date, that Plaintiff had completed work for which ES1 had not credited Plaintiff, emailed a complaint to the EM and ES2.  The emailed complaint stated, in relevant part, "If you don't believe my race, sex, age, and/or disability have anything to do with how and why I have been disparately treated, then please consider the following…"

155.     In September 2020, ES2 recommended Plaintiff for promotion and Plaintiff was promoted to a GS 11 Step 1 Investigator effective September 27, 2020.

156.     On October 20, 2021, CW3, who had been recently assigned to investigate a high priority case previously assigned to Plaintiff, spread rumors that the case had not been efficiently

and effectively managed during a monthly meeting of all Investigators, HDO and NOFO management, and the Legal Unit.

157.   At 9:42 a.m. on October 20, 2021, Plaintiff, in an email addressed to CW3, EM, DD, and Gregory Juge, Supervisory Trial Attorney, Plaintiff noted the dates and brief description of each investigative action taken by Plaintiff and CW3 regarding the case about which CW3 had earlier that day spread rumors.

158.   At 3:49 p.m. on October 20, 2021, Plaintiff, via an email attachment addressed to ES2, EM, DDD and DD, stated, "That [Plaintiff] felt compelled to preemptively address [further] mischaracterizations underscores the ongoing harassing treatment to which [Plaintiff has] been exposed for far too long, mistreatment that [Plaintiff] believe[s] is illegal and based on [Plaintiff's] race, sex, age, disability and/or in retribution for [Plaintiff] having complained of same."

159.   On October 24, 2021, ES2 reduced Plaintiff's performance rating from "Highly Effective" to "Fully Successful" in the critical element "Charge and Case Management" for Plaintiff's final rating of the 2021 fiscal year.

160.   On October 27, 2022, Plaintiff requested and was approved for FMLA leave that lasted until April 6, 2022, with two short exceptions.

161.   On January 26, 2022, ES2 emailed EM that ES2 had received a message from DRM2 that Plaintiff was logged into Plaintiff's work computer while on leave.

162.   On January 26, 2022, ES2 telephoned Plaintiff and accused Plaintiff of impermissibly logging into the Agency's internal network.  Plaintiff denied being logged into Plaintiff's work computer.

163.   On January 27, 2022, ES2 delayed approval of Plaintiff's texted request to "log in" to Plaintiff's "[work] computer" and, at 8:50 a.m. CST, demanded that Plaintiff send Plaintiff's request "in writing."

164.     At 9:57 a.m. on January 27, 2022, Plaintiff emailed ES2, EM and Malcolm Medley, NOFO Director (FD2), and complained, "…given my experiences with harassment at the hands of HDO/NOFO management, harassment I maintain is illegal and based on my race, age, disability, and/or in retaliation for complaining of same, I find this sudden request of me that I ask "in writing" (as opposed to a written text?) for permission to access my computer just another in a long line of seemingly benign demands whose intent is to harass me."

165.     At 5:04 p.m. on January 27, 2022, FD2 emailed Plaintiff and stated that the reason Plaintiff was asked to request access to Plaintiff's work computer in writing was due to a new HDO/NOFO policy designed "to document and account for authorizations, maintenance, access type and other interactions related to ARC [the Agency's new internal database]."

166.     The Agency's "Network/Desktop Rules of Behavior" states that "Access to and continued use of Network and Desktop services is granted on the condition that each employee reads, respects, and follows the EEOC's policies concerning use of these services." Plaintiff had not violated any of the Agency's network and desktop policies.

## INCORPORATION OF ALLEGATIONS

178.     All of the allegations in each of the foregoing paragraphs are incorporated by reference into each of the following claims for relief as if fully set forth in each such claim.

## FIRST CLAIM FOR RELIEF

### Violation of Title VII-Race and Sex (Disparate Treatment)

179.     The effect of the Defendant's actions, as alleged above, denied Plaintiff equal employment opportunities and discriminated against her based on her race and/or sex in violation of Title VII. Plaintiff is a member of a protected class under Title VII as she is a White female. Plaintiff was intentionally not onboarded with the Defendant as a GS 5 Step 6 or higher and Plaintiff's SF-50 was intentionally filed with OCHCO with incorrect information regarding

Plaintiff's education level to help justify Defendant's onboarding GS grade and step of Plaintiff, all which deprived Plaintiff of an onboarding payrate comparable to Comparator 1.  Defendant's discrimination of Plaintiff at the onset of Plaintiff's employment with the Defendant had a cascading effect, in that, Plaintiff was denied the opportunity to be promoted as a GS 7 Step 5 when Plaintiff was promoted to Investigator in June 2018.

180.     Plaintiff was intentionally discriminated against in the terms and conditions of her employment when Defendant showed a pattern of ignoring and excluding Plaintiff from equal opportunities to participate in work-related matters and conversations that hindered Plaintiff's professional growth, including having been intentionally excluded from work onsites, outreach, and social events which further harmed Plaintiff.  Despite the discrimination, Plaintiff produced work, work for which Defendant later failed to credit Plaintiff and, subsequently, Defendant used false information to delay Plaintiff's June 2020 promotion by almost four months costing Plaintiff more than $4,000 in lost wages and benefits.   The discrimination negatively affected Plaintiff's professional standing with the Defendant and harmed Plaintiff financially which, in turn, negatively affected Plaintiff's mental and phyiscal health and family relationships.

181.     The effect of the Defendant's actions, as alleged above, denied Plaintiff equal employment opportunities and discriminated against her based on her race and sex. Based on her race and sex, White female, Plaintiff was treated differently and less favorably than a similarly situated person who was outside of her protected class when Plaintiff was targeted and singled out by management and co-workers and accused of performance failures and multiple process and/or policy transgressions that were later proven to be false.  Based on Plaintiff's knowledge, information and belief, Plaintiff's Comparator was not accused of stealing time, was not accused of attempting to steal time, was not accused of frivolous allegations of misconduct, was not assigned to conduct intake outside of the intake schedule for Friday afternoons, was not directed

by Sr. Investigators to violate a protocol mandated by a supervisor, was not given middling evaluations by a supervisor and never had her performance rating reduced, was not denied promotion on her June 10, 2020, anniversary date despite Comp1's failure to achieve a performance goal marker achieved by Plaintiff and other NOFO Investigators who were promoted from GS 9 to GS 11 Investigators, was not excluded from participation in work-related matters and social functions, and whose work product was appropriately credited to Comp1 by their shared supervisor.

182.    Plaintiff was treated differently and less favorably than the similarly situated person outside her protected class when Plaintiff was required to show proof that she had timely performed work that Defendant intentionally failed to document, a required endeavor that further diminished Plaintiff's equal opportunity to perform the essential duties of her job.  Defendant's pattern of forcing Plaintiff to disprove negatives, e.g., proving that Plaintiff had not stolen time; had not disobeyed supervisory instructions; had not acted discourteously in front of the public; had not refused to interview a waiting charging party; had not jeopardized the privacy of Agency files when conducting vanpool telework; had not been "derelict in her duties;" had not allowed a high priority charge to languish; and had not logged into her work computer without permission; robbed Plaintiff of the same terms and conditions of employment enjoyed by Plaintiff's Comparator.

183.    Plaintiff was treated differently and less favorably than a similarly situated person who was of a different race when Defendant assigned Plaintiff work that was outside the normal parameters of time for requiring performance of the work.

184.    During Plaintiff's and  Comp1's shared mentoring period, Defendant intentionally discriminated against Plaintiff by ensuring that Plaintiff was not given an equal opportunity to timely participate in onsites and conduct outreach.

185.    Plaintiff was intentionally discriminated against by Defendant based on Plaintiff's protected class, White female, when Defendant repeatedly violated its harassment policy and failed to timely and appropriately report and investigate Plaintiff's claims of race-based harassment despite Defendant knowing that the NOFO's Enforcement Unit had a recent history of race-based harassment allegations involving the Enforcement Unit.

186.    Defendant intentionally discriminated against Plaintiff's protected class, White female, when it accused Plaintiff of stealing time shortly after Defendant announced that Plaintiff had been selected for promotion to Investigator.

187.    Plaintiff was intentionally discriminated against by Defendant based on Plaintiff's race when Defendant removed Plaintiff from vanpool telework and forced Plaintiff to change Plaintiff's 4/10 work schedule.  The alternating and dubious reasons given for the decision occurred only after Plaintiff complained of co-worker and management harassment and after Plaintiff began using the vanpool service and working the same schedule as a non-Investigator African American Co-worker who, for more than ten years prior, had continually used the commuter service and enjoyed the 4/10 work schedule.

188.    The Defendant intentionally discriminated against Plaintiff based on Plaintiff's race and sex, White female, when Plaintiff was derisively singled out by two co-workers and a management official during a staff meeting, none of whom were in Plaintiff's protected class.

189.    As a result of the actions previously stated, Plaintiff suffered discrimination by S5, S4, S3, FD2, DRM1, DRM2, EM, ES1, ES2, Comp1, CW1, COMP2, CW2, CW3, CW4 and CW5.

190.    Plaintiff has suffered financial injury as a result of the Defendant's treatment.

191.    Plaintiff has suffered irreparable injury from the Defendant's discriminatory enforcement of and omission from applying Defendant's policies and practices as stated in this complaint.

31

192.     As a result of Defendant's actions and omissions, Plaintiff has suffered emotional and mental anguish, aggravation of the same, injury to her health and family relationships, and development of a new disability diagnosed in or near late November 2021.

193.     Defendant acted with intent, malice and reckless disregard, in violation of Plaintiff's civil rights, therefore entitling her to equitable relief and/or exemplary damages.

194.     Plaintiff is entitled to monetary damages for Defendant's violation of her rights as guaranteed by Title VII.

### SECOND CLAIM FOR RELIEF

### Violation of the Rehabilitation Act of 1973

195.     The effect of the Defendant's actions, as alleged above, denied Plaintiff equal employment opportunities and discriminated against her based on her disability.  Plaintiff is a member of a protected class under the Rehab Act as she is a qualified individual with a disability.

196.     Since 2005, Plaintiff has been under the care of a physician and treated without interruption for Generalized Anxiety and Depression.

197.     Under the Commission's regulations, a federal agency may not discriminate against a qualified individual based on disability.

198.     Defendant knew from the inception of Plaintiff's employment that Plaintiff was a qualified person with a disability due to Plaintiff's Schedule A hiring under a special authority. Defendant intentionally discriminated against Plaintiff based on Plaintiff's disability when it onboarded Plaintiff at a lower GS Step than Comp1 and failed to accurately record Plaintiff's education level despite Plaintiff's application package that clearly showed Plaintiff's wide and deep breadth of professional and academic accomplishments.

199.     Further, Defendant was present for the meeting in May 2019 when Plaintiff provided details of Plaintiff's disability and the medications and dosages prescribed to Plaintiff by

her treating physician. Defendant intentionally discriminated against Plaintiff based on Plaintiff's disability when part of the reasonable accommodation provided to plaintiff in May 2019, which was based on Plaintiff's need to lessen Plaintiff's three-hour round-trip commute so that Plaintiff could more effectively perform the essential duties of her position, was partially and effectively removed by Defendant when it discontinued the practice of allowing Plaintiff to conduct vanpool telework that Plaintiff had been conducting for more than one year without incident.

200.    The effect of Defendant's actions, as alleged above, deprived Plaintiff of the equal employment opportunities and discriminated against her based on her disability, in violation of the Rehab Act.

201.    Plaintiff has suffered discrimination by S5, S3, DRM1, DRM2, EM and ES1 based on the actions listed above.

202.    As a result of the Defendant's actions, Plaintiff has suffered emotional and mental anguish, aggravation of the same, which resulted to injury to her health, the health of her family relationships, and development of a new disability diagnosed in or near late November 2021.

203.    Defendant acted with intent, malice and reckless disregard, in violation to Plaintiff's civil rights, therefore, entitling her to equitable relief and/or exemplary damages.

204.    Plaintiff is entitled to monetary damages for Defendant's violation of her rights as guaranteed by the Rehab Act.

## THIRD CLAIM FOR RELIEF

### Violation of the Age Discrimination in Employment Act of 1967

204.    The effect of the Defendant's actions, as alleged above, denied Plaintiff equal employment opportunities and discriminated against her based on her age in violation of the ADEA. Plaintiff is a member of a protected class under the ADEA as she is fifty-eight (58) years of age. Plaintiff

was intentionally not onboarded with the Defendant as a GS 5 Step 6 or higher and Plaintiff's SF-50 was intentionally filed with OCHCO with incorrect information regarding Plaintiff's education level, which deprived Plaintiff of an onboarding payrate comparable to Comp1's who was not in the protected age group.

205.    Defendant intentionally discriminated against Plaintiff's protected class, older than 40 years of age, when it accused Plaintiff of stealing time shortly after Defendant announced that Plaintiff had been selected for promotion to Investigator.

206.    Defendant was aware of Plaintiff's age prior to Plaintiff's January 2017 hiring because Plaintiff's resumé, provided by Plaintiff to Defendant in late 2016 as part of her ISA application package, stated that Plaintiff had earned her bachelor's degree in December 1985, a copy of which Defendant requested on January 23, 2017.

207.    Defendant, who appropriately investigated the race-based harassment allegations reported by COMP2, who was not in the PAG and was more than twenty (20) years younger than Plaintiff, failed to report and investigate, pursuant to Defendant's policies, the race, sex, age and disability-based allegations repeatedly reported by Plaintiff, which allowed the discrimination to continue unabated.

208.    Plaintiff has suffered discrimination by S5, S3, DRM1, DRM2, EM1, ES1 and ES2 based on the actions listed above.

209.    As a result of the Defendant's actions, Plaintiff has suffered emotional and mental anguish, aggravation of the same, which resulted in injury to her health, the health of her family relationships, and development of a new disability diagnosed in or near late November 2021.

210.    Defendant acted with intent, malice and reckless disregard, in violation of Plaintiff's civil rights, therefore, entitling her to equitable relief and/or exemplary damages.

211.     Plaintiff is entitled to monetary damages for Defendant's violation of her rights as guaranteed by the ADEA.

## FOURTH CLAIM FOR RELIEF

### Violation of Title VII, the Rehab Act, and the ADEA-
### Hostile Work Environment

211.     To establish a claim of discriminatory harassment that creates a hostile work environment, a Plaintiff must show that:

a)     She is a member of the statutorily protected class;

b)     She was subjected to harassment in the form of unwelcome verbal or physical conduct involving the protected class;

c)     The harassment complained of was based on the statutorily protected class; and

d)     The harassment affected a term or condition of employment and/or had the purpose or effect of unreasonably interfering with the work environment and/or creating an intimidating, hostile, or offensive work environment." *Gibson v. Department of Homeland Security*, 109 LRP 3147 , EEOC No. 0720060079 (EEOC OFO 2008), citing *Humphrey v. U.S. Postal Service*, 99 FEOR 3090 , EEOC No. 01965238 (EEOC 1998).

In assessing whether a hostile work environment exists, all of the circumstances must be considered, "including the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; whether it was hostile or patently offensive; [and] whether the alleged harasser was a co-worker or a supervisor." *Henderson v. U.S. Postal Service*, 109 LRP 609 , EEOC No. 0120083298 (EEOC OFO 2008), citing *Harris v. Forklift Systems, Inc.*, 93 FEOR 9003 , 510 U.S. 17 (1993). Whether an objectively hostile or abusive work environment exists is based on whether a reasonable person in the complainant's circumstances would have found the alleged behavior to be hostile or abusive. The incidents must have been "sufficiently severe or pervasive to alter the conditions of complainant's employment and create an abusive working environment." *Meritor Savings Bank v. Vinson*, 86 FEOR 9002 , 477 U.S. 57 (1986); *Harris v. Forklift Systems, Inc.*, 93 FEOR 9003 , 510 U.S. 17 (1993). The EEOC will examine the totality of a complainant's allegations to determine if a pattern of discrimination is alleged. Although the allegations may fail individually to state a claim, taken

together they may be sufficient to allege a hostile work environment. *Rico v. U.S. Postal Service,* <u>108 LRP 44743</u> , EEOC No. 0120082463 (EEOC OFO 2008).

212.    The effect of the Defendant's actions, as alleged in this complaint, discriminated against Plaintiff and subjected her to a hostile work environment based on her race, sex, disability and age in violation of Title VII, the Rehab Act and the ADEA. Plaintiff is a member of a protected class under the Rehab Act, Title VII and the ADEA as she is a qualified individual with a disability, White female, and is greater than forty years of age. Plaintiff was subjected to harassment in the form of unwelcome verbal or physical conduct involving the protected class when she was: told by Defendant that the Defendant "sometimes couldn't stand to be around White people;" onboarded with the Defendant in January 2017 as a GS Grade and Step that was at least five (5) Steps less than Comparator 1's and with an annual payrate that was at least $5,477 less than her Comparator 1 who was not in the same protected class as Plaintiff and despite Plaintiff making a special request of Defendant prior to hiring to have Defendant consider Plaintiff's master's degree and prior work experiences; reported by Defendant, on Plaintiff's onboarding and all subsequent SF 50s, as being a "high school graduate" rather than holding a master's degree despite Plaintiff's application resumé noting the month and year Plaintiff earned her master's and despite Plaintiff having provided a copy of her master's degree to the Defendant on January 24, 2017; issued a verbal warning by the Defendant after Plaintiff had shown Comparator 1 a more efficient way to complete a special project Defendant assigned to them; forced by the Defendant to duplicate work after Plaintiff highlighted in yellow the names of the copied recipients on four dismissal notices; tasked to show that Plaintiff's arrival and departure times had been approved by Plaintiff's supervisor and that Plaintiff was not stealing time; advised by the Defendant to personally incur the costs of obtaining an iPad and internet hot spot to conduct vanpool commute work and, after one year of successfully conducting the vanpool work and incurring the personal and ongoing

costs, Plaintiff was removed from the vanpool work and given alternating and dubious reasons by Defendant for the removal; repeatedly ignored by Defendant in meetings only to acknowledge Plaintiff when dissing her; not provided with the same professional opportunities as afforded to Plaintiff's Comparator and then was harshly evaluated by the Defendant and delayed in promotion despite Plaintiff's demonstrable and continuous upward trend in performance and despite the hostile work environment; not credited for a significant amount of Plaintiff's production and was not timely promoted by Defendant; tasked to prove to Defendant that Plaintiff had performed work for which Defendant did not credit her; not effectively and appropriately shielded from harassment despite Plaintiff having reported the harassment to Defendant on numerous occasions; told that Plaintiff could show that the Defendant had "diversity" by Plaintiff remaining in a proposed video whose other participants were not in the same protected class as Plaintiff; not automatically given the highest evaluation rankings and was not automatically promoted like Comparator 1; sabotaged by Defendant while attempting to follow Defendant's intake mandates and then accused of behaving unprofessionally; assigned intake work that was outside the normal parameters for conducting such work; accused a second time of attempting to steal time; excluded from important meetings, timely participation in onsites and outreach, and social functions; not properly mentored and trained; partially removed from a reasonable accommodation less than three months after the reasonable accommodation was implemented; reported by Defendant to the discriminating managing official about whom Plaintiff had complained; humiliated while in a meeting with Defendant's management and staff when Defendant suggested a high priority case, to which Plaintiff had previously been assigned, had not been appropriatly managed; evaluated less favorably in the performance critical elment "Charge and Case Management" after having been previously rated as "Highly Effective;" accused of "dereliction of [Plaintiff's] duties" after appropropriatley and timely uploading audio files into a case's digital file; targeted for allegedly

abusing Defendant's "Network and Desktop" usage rules and then given alternating and dubious reasons for enforcement of an unannounced and unpublished policy;  denied timely access to Plaintiff's work computer and desktop despite Plaintiff's request for access having been in keeping with a long-practiced procedure.

213.    The harassment complained of was based on the statutorily protected class.

214.    The above referenced actions of the Defendants affected the terms or conditions of employment and/or had the purpose or effect of unreasonably interfering with the work environment and/or creating an intimidating, hostile, or offensive work environment.

215.    Based on the actions listed above, Plaintiff has suffered harassment by S5, S4, S3, FD2, DRM1, DRM2, EM, ES1, ES2, Comp1, CW1, COMP2, CW2, CW3, CW4 and CW5.

216.    Plaintiff notified S5, S3, FD2, EM, ES1 and ES2 of the alleged harassment. S5, S3, FD2, EM, ES1 and ES2 failed to exercise reasonable care to prevent and promptly correct the harassing behavior and/or conduct. Therefore, Defendant is liable for the harassment Plaintiff was subjected to by S5, S4, S3, FD2, DRM1, DRM2, EM, ES1, ES2, Comp1, CW1, COMP2, CW2, CW3, CW4 and CW5.

217.    The said environment was so hostile and offensive that Plaintiff suffered a panic attack while driving on December 19, 2019, a symptom of Plaintiff's disability that Plaintiff had not experienced since 2005, and developed a new disability diagnosed in or near late November 2021.

218.    Plaintiff has suffered irreparable injury from the Defendant's disproportionate and discriminatory application of performance goals and omission from enforcement of Defendant's anti-harassment policies and practices as stated in this complaint.

219.     As a result of the Defendant's actions and omissions, Plaintiff has suffered emotional and mental anguish, aggravation of the same, injury to her health and developed of a new disability that was diagnosed in or near late November 2021.

220.     Defendant acted with intent, malice and reckless disregard in violation of Plaintiff's civil rights, therefore, entitling her to equitable relief and/or exemplary damages.

221.     Plaintiff is entitled to monetary damages for Defendant's intentional violation of her rights as guaranteed by Title VII, the Rehab Act and the ADEA.

## FIFTH CLAIM FOR RELIEF

### Violation of Title VII, the Rehab Act, ADEA-Retaliation

222.     To establish a *prima facie* case of retaliation, Complainant must show that: (1) she engaged in prior protected activity; (2) the Agency was aware of the protected activity; (3) she was subsequently subjected to adverse treatment by the Agency; and (4) a nexus exists between the protected activity and the adverse treatment. *McMillen v. U.S. Postal Serv.*, EEOC Appeal No. 0120072556 (Feb. 26, 2009); *Whitmire v. Dep't of the Air Force*, EEOC Appeal No. 01A00340 (Sept. 25, 2000).

223.     An initial inference of retaliation arises where there is proof that the protected activity and the adverse action were related. *EEOC Compliance Manual Section 8: "Retaliation,"* No. 915.003, at 8-18 (May 20, 1998). Typically, the link is demonstrated by evidence that: (1) the adverse action occurred shortly after the protected activity, and (2) the person who undertook the adverse action was aware of the complainant's protected activity before taking the action. *Id.*

224.     Plaintiff complained to Defendant of not being treated the same as Comparator twice during the late summer and early fall of 2018. In response, Defendant failed to assign Plaintiff to

participate in her first onsite until May 29, 2019, which was more than one year after Plaintiff's

Comparator 1 had been assigned, and effectively stymied Plaintiff's timely professional growth.

225.    Plaintiff requested and received a reasonable accommodation on May 20, 2019.  In

response, Defendant effectively reduced the reasonable accommodation on August 19, 2019, when

Plaintiff was forced to change her work schedule from 4/10 to 5/4/9, depriving Plaintiff of two

days of not working and not commuting each 4-week period.

226.    Plaintiff complained, on May 24, 2019, to Defendant of co-worker bullying allegedly

based on Plaintiff's protected bases.  In response, Defendant threatened to remove Plaintiff from

her vanpool telework in late July 2019.

227.    Plaintiff complained, on August 8, 2019, that Defendant was ignoring Plaintiff based

on Plaintiff's race.  In response, on August 19, 2019, Plaintiff was removed from vanpool telework

and was forced to change her 4/10 schedule to 5/4/9.

228.    Plaintiff contacted the Office of Employment Opportunity on December 26, 2019.

Her formal complaint was filed on April 13, 2020. Management was made aware of her activity

in January 2020, on March 12, 2020, on April 20, 2020, and again on April 28, 2020.  Between

January 2020 through May 24, 2020, Defendant credited Plaintiff with less than 40% of the work

completed by Plaintiff and, on May 8, 2020, did not recommend Plaintiff for promotion from a GS

9 Step 1 to GS 11 Step 1 Investigator effective June 10, 2020.

229.    Plaintiff complained to Defendant of alleged retaliation and harassment based on

Plaintiff's race, sex, age, and disability on June 11, 2020, and September 11, 2020, respectively.

In response, management promoted Plaintiff to a GS 11 Step 1 but made the effective date of the

promotion September 27, 2020, instead of June 10, 2020, depriving Plaintiff of more than $4,000

in earnings and benefits between June 10th and September 27th.

230.    On October 20, 2021, Plaintiff complained to Defendant of harassment based on Plaintiff's race, sex, age, and/or disability.  Four days later, or on October 24, 2021, Defendant reduced Plaintiff's performance rating from "Highly Successful" to "Fully Satisfied" in the critical element "Charge and Case Management."

231.    Almost three months after engaging in protected activity in October 2021, Defendant targeted Plaintiff on January 26, 2022, chose to ignore Plaintiff's defense against a discriminatory allegation and, on January 27, 2022, enforced a policy against Plaintiff that has not been announced or published to date.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays that this Court enter a judgment:

1.    Declaring that the acts and practices complained of herein are in violation of Title VII, the Rehab Act, and the ADEA;

2.    Awarding Plaintiff any back pay with interest on any back pay awarded;

3.    Awarding Plaintiff any liquidated damages with interest on any liquidated damages awarded;

4.    Awarding Plaintiff compensatory damages, both pecuniary and non-pecuniary and such other monetary relief as may be deemed appropriate in amounts to be determined at trial;

5.    Awarding Plaintiff prejudgment and post judgment interest to the maximum extent permitted by law;

6.    Awarding Plaintiff, the cost of this action together with expert witness fees and reasonable attorney's fees; and

7.    Granting such other and further relief as this Court deems necessary and proper.

## **DEMAND FOR TRIAL BY JURY**

In accordance with Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands

a trial by jury in this action.

Respectfully submitted by:

Bridget J. Thomas
*Pro Se*
608 Beyer Drive
Bay Saint Louis, MS 39520

## CERTIFICATE OF SERVICE

This will certify that the attached pleading was served on November 8, 2022, by electronic mail on the following parties:

Elizabeth A. Chickering
Assistant U. S. Attorney
Elizabeth.chickering@usdoj.gov

Bridget J. Thomas
*Pro Se*
608 Beyer Drive
Bay Saint Louis, MS  39520
bjthomas@eatel.net

43

**LAEDdb_ProSeDocs**

| | |
|---|---|
| **From:** | bjthomas@eatel.net |
| **Sent:** | Tuesday, November 8, 2022 2:11 PM |
| **To:** | LAEDdb_ProSeDocs |
| **Subject:** | Civil Action No. 22-03511, Thomas v. Burrows (EEOC) |
| **Attachments:** | 2022-11-08 First Amended Complaint wout exhibits.pdf |

CAUTION - EXTERNAL:

Good afternoon:

I am attaching Plaintiff's First Amended Complaint to this email and respectfully request that you insert same into the electronic record of Civil Action No. 22-03511, Bridget J. Thomas v. Charlotte Burrows, Chair, Equal Employment Opportunity Commission.

Please note that I have two (2) exhibits to be included with the filing but could not include same in this email due to the size of the digital file. If I am required to provide you with one digital file inclusive of the exhibits, i.e., one pdf of the amended complaint inclusive of the 2 exhibits, please inform me of same and I'll quickly run to my local library to obtain their assistance.

I will follow this email with two additional emails with Exhibits One and Two attached, respectively.

Should you have any questions or seek to provide me with instructions, please feel free to contact me via email or my cell number.

Kindest regards,
Bridget J. Thomas
bjthomas@eatel.net
(225) 270-3194

CAUTION - EXTERNAL EMAIL: This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.